Statement of the Case.
MONBOE, J.
Plaintiff alleges that he acquired by purchase from B. M. Miller, who acquired from J. S. Bossier, who, with P. F. Herwig, acquired from Mrs. Fortier and Miss Vignie, an undivided one-fourth interest in a tract of land in St. Tammany, which, for convenience, we will call the “Vignie Tract,” and that the remaining interest is owned “or claimed” by Frederick W. Eieholz, Mrs. Bossamond E. Kuntz, wife of Emile Kuntz, Ernest L. Herwig, Augustus C. Herwig, Albert G. Phelps, and Martin H. Sullivan; that he is unwilling to hold the property in indivisión; and that he desires a partition of the same by licitation, wherefore he prays for citation and for judgment accordingly. All the defendants named, save Mrs. Kuntz, were admitted, or shown, to be without interest, and may be regarded as eliminated. Mrs. Kuntz, for answer, denies that plaintiff has any valid title and sets up a superior title in herself to the whole tract, and, further answering, alleges that, should the title set up by plaintiff be maintained, he should be held liable for certain moneys advanced to and for his author, Bossier, wherewith to pay his sh&re of the purchase price of the property, to pay the taxes, and for other purposes.
The pertinent facts disclosed by the evidence are as follows; (1) On June 7, 1887 > J. S. Bossier and P. F. Herwig bought the Vignie tract for $4,276, of which (according to the recitals of the notarial act under *748 which they acquired) $2,500 was paid in cash, and the balance was represented by four notes, of $444 each (two of them made by Bossier and two by Herwig), secured by a mortgage, which was recorded on June 13, 1887, and reinscribed on January 8, 1898. (2) On June 8, 1887, Bossier mortgaged his interest in the property to secure $1,087.50, said to have been borrowed from Herwig, and represented by a note, and the mortgage was recorded on June 16, 1887, and reinscribed on January 7, 1898. (3) On May 15-17, 1897, the entire tract was adjudicated for the taxes of 1896 to Mrs. Kuntz, Herwig’s daughter. (4) On November 28, 1898, Bossier imposed a mortgage upon his interest to secure $4,000, said to have been borrowed from P. E. Bechtel, and represented by four notes of $1,000, each, and the mortgage was recorded on December 1, 1898, but does not appear to have been reinscribed. (5) On May 29, 1902, Bossier, through, B. M. Miller, his attorney, brought suit to set aside the tax sale to Mrs. Kuntz, and the suit was decided against him by the district court on June 16, 1903. 1-Ie, however, on the same day took an appeal to this court. (6) Pending the appeal so taken, to wit, on July 31, 1903, Bossier executed a written instrument, agreeing to transfer one-half of his interest in the property in question to his attorney, B. M. Miller, or, at the option of the latter, pay him one-half of the price for which such interest might be sold, as a consideration for his services in bringing and prosecuting to a final decision the' suit above mentioned, which instrument (not signed by Miller) was recorded in “mortgage book J” of the parish on March 19, 1904. (7) In March, 1904, this court handed down an opinion and decree reversing the judgment of the district court in the suit mentioned, holding that the title of Bossier had not been devested by the tax adjudication, and making certain reservations in favor of the defendant Mrs. Kuntz. (8) On May 28, 1904, Mrs. Kuntz (aided by her husband) brought suit against Bossier, attacking his original title, alleging that the whole purchase price had been paid by her father, P. E. Herwig, by whom and by herself after the tax sale all the taxes had been paid; that Bossier had removed timber from the land in part settlement for which he had given his four notes of $1,000 each; and that, in truth, he never acquired any interest in the property, but was merely a person interposed by Her-wig for his convenience. She further alleged that she had acquired a half interest in the property by inheritance from her mother, and had acquired her father’s interest by means of the tax sale, and, propounding interrogatories on facts and articles to Bossier in line with her allegations, she prayed for judgment decreeing that he ..had never acquired any interest in the property. To the suit thus brought Bossier, through Mr. Miller, his attorney, interposed various exceptions and an answer, and the litigation dragged slowly along until January 14, 1905, when defendant was ordered to show cause on January 21st following why certain of his exceptions should not be overruled and his answers to certain of the interrogatories on facts and articles taken for confessed, and since then nothing further appears to have been done in the case. s(9) On March 29, 1905, Bossier executed a notarial act, conveying to B. M. Miller one-half of his interest in the land in question for the consideration of $1 and of “the contract signed by me” (him) “July 31, 1903,” and the act was recorded April 18, 1905. (10) On April 11, 1905, Bossier, by notarial act, sold the whole of his said interest to E. W. Eichoiz for $250 cash, and the act was recorded April 13, 1905. (11) On February 4, 1908, Miller, by notarial act, sold the property acquired or supposed to have been acquired from Bossier to Clay Riggs, plaintiff herein, and the act was recorded May 22, 1908. (12) On December 28, 1908, Eichoiz by notarial act sold the property acquired or supposed *750 to have been acquired by him from Bossier to Mrs. Kuntz, but it is not shown that the act has been recorded.
Eieholz, called as a witness, was asked:
“It is set up in' the answer by Mrs. Kuntz that J. S. Bossier conveyed to you the lands here in dispute, * * * and that in so doing you were acting as the agent for the use and benefit of Herwig, and (he) on his part was acting for the purpose of acquiring title — is that correct?”
To which he answered:
“Yes; that is correct. Mr. Herwig sent me to Mr. Hero’s office and told me that lie wanted to settle with Mr. Bossier, and settle this thing through me.”
Mrs. Kuntz testified that since the tax adjudication her husband has acted as her agent in all matters relating to the land in question, and she makes some statements in regard to possession which show that she has not been in actual, physical possession.
Mr. Kuntz was permitted, over’ plaintiff’s objection, to give a good deal of testimony on behalf of his wife concerning matters that had nothing to do with his agency, but he also gave some competent testimony concerning matters which had come within his knowledge as agent.
Opinion.
There being no evidence before the court which would authorize a different conclusion, the notarial act of June 7, 1887, must be accepted as having conveyed the Yignie tract to Bossier and Herwig in equal proportions, and as proving that each of the purchasers paid $1,250 as his half of the cash portion, and gave his two notes for $444 each for his half of the credit portion of the price.
The question, then, is: When did Bossier part with the property thus acquired by him, and to whom did he convey the legal title? Plaintiff relies on the agreement of July 31, 1903, between Bossier and Miller, recorded in the mortgage book March 19, 1904, and the act of sale from Bossier to Miller of March 29, 1905, recorded in the conveyance book April 18, 1905. We may as well, however, eliminate the act last mentioned, because, though executed some three weeks before the sale to Eieholz, it was utterly null and void as to him until recorded, and it was not recorded until seven days had elapsed after he had bought the property and five days had elapsed after he had recorded his title. McDuffie v. Walker, 125 Da. 152, 51 South. 100.
There is no charge of fraud against either Eieholz or Mrs. Kuntz in connection with the transaction thus referred to, and, if there were, there is no evidence to sustain it. Without going into the question whether the debts were at that time prescribed, there seems to be no doubt that Herwig, of whom defendant is the daughter and heir, then held Bossier’s notes, which had been secured by mortgage on the property in question, as follows: The two notes for $444 each, given for the purchase price, dated June 7, 1S87; the note for $1,087.50, dated June 8, 1898 (the day after the purchase); and the four notes for $1,000 each, dated November 28, 1898, all of them wholly unpaid in principal and interest. It is equally beyond dispute that Bossier has never paid any taxes on the property, but that the whole of that burden has been borne by Herwig, and by the defendant. With regard to the payment of the taxes prior to the tax sale, we find the following admission in the record, to wit:
“It is admitted that Mr. Bossier testified in that case [referring to the case in which the tax sale was set aside] that he had not paid any of the taxes upon the real property in question at any time, and that the same had been paid by Mr. Herwig.”
The payment of the taxes by Mrs. Kuntz, after the adjudication of the property, is proved by the testimony of her husband, who, as to that, acted as her agent. The facts thus stated seem to point to the conclusion that Mrs. Kuntz’ allegations (in the suit brought by her, after the decision on the tax title) that Bossier was merely interposed *752 in the original title' for the convenience of Herwig, and that he never paid any part of the price of the property, and really had no interest in it, were substantially true, and that idea is strengthened by the fact that having been ruled to show cause on January 21, 1905, why his answers to certain interrogatories on facts and articles propounded to him on that subject should not be taken as confessed, he appears to have thrown up his hands, and, after the conveyance to his attorney of one-half of his apparent interest in the property, to have conveyed the whole of such interest to Eicholz, acting for Herwig.
It may be that, though believing that the debts and mortgages against him and the property were prescribed and perempted, he recognized a moral obligation of some sort, or, on the other hand, felt that' he must lose the suit, on the question of title, if he answered the interrogatories. And either hypothesis would afford an explanation of the sale to Eicholz, and exonerate hinj from any imputation of fraud," there being no evidence and no suggestion that either he or those for whom he was acting knew anything of Bossier’s agreement with Miller or of the sale predicated thereon, the latter being then unrecorded, and the former having been recorded only in the mortgage book. The learned counsel for plaintiff suggests that the conveyance to Eicholz “was either a pure simulation or a prohibited substitution and conveyed no title at all.” If, however, Bossier acted in the belief that the property was incumbered by the debts and mortgages contracted and imposed by him, to which we have referred, or acted in recognition of the moral obligation left behind (if we assume that these debts and mortgages were prescribed and perempted), or if he felt that he was bound to lose in the pending suit on the rule to take his answers for confessed, the fact that he was willing to accept $250, and retire, is no indication that the sale was simulated ; in fact, taking the whole case as presented, there is not the slightest room for a suspicion that it was not intended to devest, and invest, the title to the property. Nor is there any basis for the 'contention that the transaction was a prohibited substitution, since the instrument of conveyance is an ordinary act of sale, and it nowhere appears, and is nowhere suggested, that as between the vendor and vendee the one conveyed, or the other received, the property on any other conditions than those mentioned in said act. We recur, then, to the agreement between Bossier and Miller of July 31, 1903. That agreement did not purport to convey the property, but was merely an agreement to convey it, or, at the option of Miller, to pay him one-half the amount for which the property might be sold. If it is to be regarded as a conveyance, it should, in order to affect third persons, have been recorded in the conveyance office or book, and it was not so recorded, but was recorded in the mortgage book. The law provides that (Civ. Code, art. 2264):
“No notarial act, concerning immovable property, shall have any effect against third persons until the same shall have been deposited in the office of the parish recorder or register of conveyances where such immovable property is situated.”
And that (Civ. Code, art. 2266):
“All sales * * * affecting immovable property which shall not be so recorded shall be utterly null and void, except as between the parties thereto.”
Construing the law as it then existed, our predecessors in this court, speaking through Eustis, C. J., have said:
“Bartlett’s title was not recorded in the office of-the parish judge, * * * but was recorded in the register of mortgages; and the decision of the case depends on the respective rights of the parties, under a sheriff’s sale, and an unrecorded notarial act, * * * the record in the mortgage office not being a compliance with our registry laws concerning the. sale of real property. * * * It is in evidence that the plaintiff’s attorney, before the issuing of the fieri facias under which they became the purchasers, was apprised of the act of sale to *754 Bartlett and of its being recorded in the mortgage office; but that on finding no record of it in the office of the parish judge he had the lot seized and bought in for his clients, the plaintiffs. As we consider the rights of the plaintiffs to have the property sold to satisfy their debt paramount to that of the defendant, under his unrecorded deed, by virtue of their recorded judgment, we do not see how that right can be impaired by this knowledge on the part of the attorney.” Tulane v. Levinson, 2 La. Ann. 788-789.
Since the decision thus quoted was rendered the office of parish judge has been abolished, and there has been created, for each parish, the parish of Orleans excepted, an officer styled “recorder,” upon whom a great many powers are conferred, such as making inventories, partitions, conveyances, etc.
“They shall also [reads the statute] be recorder of mortgages, register of conveyances and marriage contracts, recorder of births and deaths, and of marks and brands.” Rev. St. § 3066.
Although, therefore, the functions of recorder of mortgages and register of conveyances are thus combined in one person, those functions are to be separately discharged as though they were imposed on different individuals, and an act of conveyance is to be delivered to the officer, in his capacity of register of conveyances, and not in his capacity of recorder of mortgages, any more than of recorder of births and deaths, or marks and brands.
If it be suggested that the agreement in question, recorded in the mortgage book, operated as a privilege on the property, the answer is that under the law as it stood at that time the privilege of an attorney for his fee was allowed upon the judgment obtained by him, but did not extend to the property recovered as the result of the judgment. Insurance Co. v. Levi, 40 La. Ann. 135, 3 South. 559; Smith v. Vicksburg S. & P. R. Co., 112 La. 985, 36 South. 826.
Our conclusion, then, is that as against defendant plaintiff discloses no title to the property sought to be partitioned, or any part of it, and hence is not entitled to maintain this action.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there now be judgment rejecting plaintiff’s demand, and dismissing this suit at his cost in both courts.